IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**June 12, 2025**

IN RE: P.S., a minor,

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

No. 24-ICA-179    (Cir. Ct. Roane Cnty. Case No. CC-44-2023-CIG-5)

## MEMORANDUM DECISION

Petitioner Brenna F.[1] ("Mother") appeals the Circuit Court of Roane County's March 26, 2024, orders that appointed Respondent Angela S. as the minor child's guardian. Angela S. and the child's guardian ad litem filed responses in support of the circuit court's order.[2] Mother did not file a reply. Respondents below, Casey S. ("Father"), Amy S., and Stacy S. ("Grandmother"), did not participate in the appeal.[3]

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the circuit court's decision but no substantial question of law. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure for reversal in a memorandum decision. For the reasons set forth below, the circuit court's decision is reversed.

Mother and Father are the biological parents of the minor child, who was born in August of 2020. While the child was still an infant, Mother and Father asked Mother's maternal aunt, Amy S., and her wife, Angela S., if they would care for the child because Mother was suffering from postpartum depression and anxiety, and both Mother and Father had to work long hours each day. Moreover, at that time, daycare centers were not

---

[1] To protect the confidentiality of the juveniles involved in this case, we refer to the parties' last names by the first initial. *See, e.g.,* W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Mother is represented by Rosalee Juba-Plumley, Esq. Angela S. is represented by Leah R. Chappell, Esq. The guardian ad litem for the minor child is Rebecca Stollar Johnson, Esq.

[3] Casey S. is the father of the child, and Stacy S. is the child's maternal grandmother. Amy S. is the child's aunt and was married to Angela S. at the time of the proceedings below. Amy S. is the sister of Stacy S. ("Grandmother"). The child resided in the home of Amy S. and Angela S. from the time she was an infant until their separation in 2023. Thereafter, the child resided in the home of Angela S.

accepting new enrollments because of the COVID-19 pandemic. Amy S. and Angela S. agreed to begin caring for the child in their home before the end of 2020. Thereafter, child began residing full-time in Amy S. and Angela S.'s home.[4] At the time Amy S. and Angela S. began caring for the child, Mother, Father, Amy S., and Angela S. were all residing in Putnam County in the same neighborhood, within walking distance of each other's homes. The child's great-grandmother and cousin also lived nearby. All these family members leased their respective homes from the same landlord. Grandmother lived in Putnam County, but not in the same neighborhood. In March of 2021, however, Grandmother relocated to Lexington, Kentucky, for employment.

The record indicates that even though the child lived with Amy S. and Angela S. and they were the child's primary caretakers, Mother and Father were still involved in the child's life and saw the child regularly, if not daily, until July of 2022. Amy S. worked outside the home, and Angela S. stayed home to care for the child. As such, Angela S. was primarily responsible for caring for the child's needs during the day and taking the child to any necessary medical appointments.

In 2022, the landlord decided not to renew the leases of Amy S. and Angela S., great-grandmother, and Mother.[5] In July of 2022, Amy S. and Angela S. left their Putnam County home and relocated to a house in Roane County, and the child's great-grandmother and cousin moved with them. By this time, Mother and Father had separated. Mother's lease was set to end in August of 2022, and as of July of 2022, she had not yet found suitable housing. As such, Mother asked Amy S. and Angela S. if they would take the child with them to Roane County, and they agreed. At this point, Mother signed a Temporary Guardianship Agreement giving Amy S. and Angela S. temporary guardianship of the child so that they would be able to obtain medical care for the child as needed. After Amy S. and Angela S. moved to Roane County in 2022, Mother was not able to spend as much time with the child because of the distance and her work schedule.

Sometime in the spring or summer of 2023, Amy S. and Angela S. separated. Amy S. moved out of the Roane County home, but the child stayed there with Angela S., great-

---

[4] The record is not clear as to when the child began residing full time in Amy S. and Angela S.'s home, but it appears that it occurred by the time the child was about six months old.

[5] The landlord, who is also Angela S.'s employer, testified at the December 28, 2023, hearing. The landlord explained that she had to evict one of the child's relatives who lived in another of her properties, which created tension between her and the family. This led her to decide to not renew Amy S. and Angela S.'s lease, as well as the leases of Mother and great-grandmother. The landlord testified that she did not evict Amy S., Angela S., great-grandmother, and Mother.

grandmother, and cousin. As of the fall of 2023, Angela S. and/or Amy S. had enrolled the child in preschool in Roane County. At that time, even though Angela S., Mother, Father, Grandmother, and Amy S. lived in separate places, they all continued to spend time with the child. The child also spent overnights with Amy S. each week and spent multiple weekends in Kentucky with Mother, Grandmother, and Father.[6]

On October 23, 2023, Angela S. received a "Notice to Pay Rent" on the Roane County home from her landlord which gave her thirty days to either pay the outstanding total or vacate the premises. On October 27, 2023, the great-grandmother and cousin, who were living with Angela S. and aware of the rent notice, took the child to visit Grandmother in Lexington, supposedly for a few days, which had been a normal occurrence. However, during this visit, Grandmother called Angela S. and told her that great-grandmother and cousin would be moving to Lexington but would be returning to Roane County to get their belongings; however, the child would not be returning.[7] The record reflects that Angela S. paid the outstanding rent owed and was not evicted from her home in Roane County.

On November 7, 2023, Angela S. filed a Petition for Appointment of Guardian for the Minor in the Circuit Court of Roane County seeking to be appointed the child's guardian. In her petition, Angela S. alleged that the child had been in her care since the child was one week old and that she was the child's psychological parent. Angela S. further alleged that a temporary guardianship was needed because the child was taken to visit family in Kentucky on October 27, 2023, and that Grandmother had refused to return the child. Moreover, Angela S. alleged in her emergency motion that Mother and Father had executed a temporary guardianship agreement on June 30, 2022, giving her temporary

---

[6] The record indicates that for at least some of these visits, Mother would drive the child to Lexington from Putnam County so that they could spend time with Grandmother together. However, it appears that Mother did not always participate in the visits between Grandmother and the child. Also, Grandmother and Father indicated in their filings below that Father also moved to Lexington sometime after 2021 and returned to West Virginia in 2022. Further, while he lived in Lexington, Father would visit the child when the child was at Grandmother's home.

[7] According to Grandmother's filings below, Grandmother started the process of finding great-grandmother and cousin a place to live in Lexington before the October 27, 2023, visit. Also, Grandmother stated in her filings that before this visit, she had spoken to Mother, and that Mother was revoking Amy S. and Angela S.'s temporary guardianship and wanted the child to move to Lexington with Grandmother. However, no one informed Angela S. of this before great-grandmother and cousin took the child to visit Grandmother on October 27, 2023.

custody of the child.[8] On that same day, Angela S. also filed a Motion for Emergency Relief asking the circuit court to grant her ex parte relief or to schedule an emergency hearing on her petition. In her motion, Angela S. further alleged that the biological parents of the minor had played no role in the child's life and had neither provided emotional support nor financial support for the child.

The circuit court held an emergency ex parte hearing on November 15, 2023. Angela S. appeared in person, and by counsel. Mother, Father, Grandmother, and Amy S. did not appear. The circuit court found that while none of the respondents had been served, service was being attempted, and proceeded with the hearing, pursuant to the rules governing emergency ex parte hearings of this nature. Upon the proffer of counsel for Angela S., the circuit court found that Angela S. was the child's psychological parent and granted her Motion for Emergency Relief. The circuit court issued an order that date requiring that the child be immediately returned to the custody of Angela S. The circuit court scheduled a final hearing for December 28, 2023.

On November 16, 2023, one day after the emergency hearing, Mother was served with Angela S.'s emergency motion and petition for guardianship. That same day, Mother filed a response.[9] Mother asserted that she had only given Angela S. temporary guardianship of the child while she was battling postpartum depression because it was in the child's best interest at the time, and that she never consented to Angela S. receiving permanent custody of her child. Mother further alleged that Angela S. initiated the proceedings without Amy S.'s knowledge, and that the Temporary Guardianship Agreement Mother executed also gave temporary guardianship of the child to Amy S.

Amy S. filed a statement with the circuit court on November 16, 2023, in which she asserted that she was not served with Angela S.'s petition for guardianship or motion for emergency relief, although she shared temporary guardianship of the child with Angela S., and that she had no knowledge of any hearing or proceeding concerning the child.[10] Father and Grandmother also filed separate answers objecting to Angela S.'s petition for guardianship of the child.

---

[8] The temporary guardianship agreement was made part of the record and indicates that Mother agreed to give temporary guardianship of the child to Amy S. and Angela S. Father did not execute the document.

[9] Mother filed a formal Answer to the petition for guardianship on or about December 11, 2023.

[10] Mother purportedly notified Amy S. of the proceeding after Mother was served.

On December 18, 2023, Angela S., by counsel, moved the circuit court to add Amy S. as a party to the action. In support of her motion, Angela S. stated that when she initially filed her petition for guardianship and motion for emergency relief, she did not believe that Amy S. wanted to participate in the matter; however, since that time, Amy S. contacted her counsel and informed them that she did want to participate.

On December 28, 2023, the circuit court held a final hearing on Angela S.'s petition for guardianship. The circuit court heard testimony from Angela S., Angela S.'s mother, Angela S.'s employer, Amy S., Mother, Father, and Grandmother. Testimony revealed that, contrary to the allegations Angela S. made in her petition for guardianship and motion for temporary relief, Amy S. and Angela S. had started providing the primary care for the child a few months after the child was born. Also, contrary to Angela S.'s allegations, testimony indicated that Mother and Father spent time with the child daily before Amy S. and Angela S. relocated to Roane County in July of 2022. All parties agreed that the child shared a bond with Angela S., that Amy S. and Angela S. had been the child's primary caretakers, and all the parties were involved in the child's life and caretaking.

Angela S., Amy S., and Mother testified that the purpose of the Temporary Guardianship Agreement was in case the child needed medical attention since the aunts had relocated, and Mother had yet to find suitable housing. Angela S. testified that after the relocation, the child spent time with all parties in-person and through FaceTime, that Mother had spent Thanksgiving with the child, and that Angela S. would continue to allow the family to visit and FaceTime the child if the circuit court granted her permanent guardianship. Angela S. further testified that Mother had only given her $300 for financial support of the child. However, Amy S. testified that Mother offered her money "on occasion," and Father offered her money "quite a bit," but that she refused to accept their money because Father and Mother were young. Amy S. also testified that Mother, Father, and Grandmother contributed financially by buying the child various things. Angela S. testified that she allows the child to refer to her as mommy and that she "just want[s] to continue to be able to be her mommy." Amy S. testified that she, too, allowed the child to call Angela S. "mommy," but that the child also called her "Ingi."

Mother testified that it was never her intention to give permanent custody of her child to Amy S. and Angela S., and that everyone knew it was a temporary arrangement. Amy S. testified that no one intended the guardianship to be permanent and that it was only temporary until Mother's mental health and personal situation improved. Amy S. further testified that up until the emergency order granting temporary guardianship of the child to Angela S., the child had always lived in a home with members of her biological family, which included great-grandmother and cousin.

At the conclusion of the hearing, the circuit court appointed a guardian ad litem for the child and directed the guardian ad litem to investigate the child's best interest concerning the case. The circuit court also entered an administrative order directing Child

5

Protective Services ("CPS") to investigate the matter and provide a written report to the court. The circuit court scheduled the next hearing for February 21, 2024.

On February 7, 2024, CPS filed its investigative report with the circuit court. For the report, the CPS worker interviewed Mother at her home, Father over the phone, Angela S. at her home, Grandmother over the phone, and Amy S. at her home. The CPS worker also interviewed the child while she was spending time at Amy S.'s home. Amy S., as well as Mother and Grandmother, told the CPS worker that Mother suffered from postpartum depression and had anxiety issues when the child was a baby because of trauma she experienced when a young relative passed away. CPS further reported that Amy S. stated that she believed Mother would ask for help if needed and that she believed that Mother was now capable of caring for the child.

Further, the CPS worker noted in her report that during the worker's interview with Angela S. at her home, Angela S. introduced a man named Joe to the worker and stated that Joe sometimes visits and watches the child for her. Angela S. reported that she allows the child to sleep with her. During the child's interview, the child told the CPS worker that she was three years old, lived "with mommy," and that Joe is also there. The worker asked if it was "mommy [Mother]" and the child stated, "no, Ingi." The child told the worker that "Joe is naked in mommy's bed." The CPS worker noted in the report that during the CPS worker's telephone interview with Grandmother, Grandmother reported that the child made a similar comment about Joe while with her. However, the report does not indicate that the CPS worker asked Angela S. about these allegations. Despite noting concerns about these comments and Joe in its report, CPS filed no petitions alleging abuse or neglect against anyone involved in this matter, and nothing more was said about Joe.

The CPS report stated that the homes of Mother and Angela S. were clean and appropriate, and that both had a separate room for the child. While the CPS worker did not visit Grandmother's home in Lexington, Amy S. informed the CPS worker that the child had her own room at Grandmother's house, as well as her own television and a kitchen playset. Further, as stated in the report, CPS confirmed that none of the parties involved in this matter had any history with CPS. Ultimately, the CPS worker recommended that "[a]t this time the West Virginia Department of Health and Human Resources feels that [the child] seems to be loved by all members of the case. With that being said, the department has some concerns about [the child] stating Joe was naked in mommy's bed. This is not typical language for a three-year-old. The department feels that [Mother's] home *may* be in the best interest of the child. She has worked on the issues that lead to her let[ting] [the child] go live with Angela and Amy" (emphasis added).

Despite the circuit court appointing the guardian ad litem to conduct her investigation by order entered January 25, 2024, it does not appear from the record that the guardian ad litem began her investigation until March 18, 2024. The final hearing on Angela S.'s petition for guardianship was scheduled to be held on March 21, 2024, and the

6

guardian ad litem filed her report on March 20, 2024, the day before. Therefore, the parties received the report either at the hearing, or the day before, at the earliest.

The guardian ad litem's report reflects that she reviewed the CPS report and considered the same in making her recommendation. In her report, the guardian ad litem states that she met with the child and Angela S. in person at the home of Angela S. on March 20, 2024. Further, the guardian ad litem spoke with Mother, Father, Amy S., and Grandmother and included in her report a summary of each of these interviews. However, the guardian ad litem did not indicate when or how she conducted each interview. In her report, the guardian ad litem recommended that guardianship be awarded to Angela S., as she and Amy S. were the child's "de facto," or psychological, parents given that they had cared for the child's needs daily for over two years, and recommended that visitation with the child between Amy S. and Angela S. be decided in their divorce action. The guardian ad litem further recommended the circuit court grant Mother and Grandmother visitation with the child every other weekend and every other week during the summer. The guardian ad litem made no recommendation as to Father receiving visitation with the child and recommended that the circuit court order Mother and Father to pay child support.

Mother, by counsel, and Grandmother objected to the guardian's report at the March 21, 2024, hearing, arguing that the guardian ad litem's report was deficient as it was "hastily" made based almost entirely on "late night telephone calls" to Mother, Grandmother, Father, and Amy S., and that the guardian ad litem had not observed the child in person interacting with Mother. The Grandmother also specifically objected stating that her call with the guardian ad litem lasted only seventeen minutes. Counsel for Mother argued that the guardian ad litem's recommendation was not in the child's best interest and that the guardianship statute gave preference to biological parents. Counsel further argued that because the child belongs to an extended family, it was not unusual for other family members to help care for the child.

In response, the guardian ad litem denied her report being hasty, but explained to the circuit court that she "had not received a single bit of paper" in the case until Monday, March 18, 2024, but she defended her investigation, report, and recommendation. When the circuit court asked if the guardian ad litem needed additional time before making her recommendation, she informed the circuit court that she did not. The guardian ad litem did not dispute that all the interviews she conducted aside from those of the child and Angela S. were conducted telephonically or that she did not observe the child with Mother. The guardian ad litem further explained to the court that after she spoke to the parties, she informed them that they could call her anytime to give her more information, and they did not. However, the guardian ad litem stated that she spoke to great-grandmother upon Grandmother's suggestion. Notably, the guardian's report lacked a summary of any such interview. The circuit court made no rulings on the record at the March 21, 2024, hearing.

On March 26, 2024, the circuit court entered the two following final orders: 1) Order Granting Petition for Guardianship, Appointment will be Made by Separate Order; and 2) Order of Appointment of Minor Guardian. In the former, the circuit court reiterated some of the guardian ad litem's findings and recommendation included in her report and granted Angela S.'s petition for guardianship. The court additionally awarded Mother and Grandmother parenting time with the child every other weekend and every other week during the summer.[11] In the latter, the circuit court, by "[g]iving precedence to the welfare and best interest" of the child "and the importance of a competent and fit guardian, and considering the Guardianship Screening Factors outlined in Rule 10 of the Rules of Minor Guardianship Procedure, based upon the evidence presented" appointed Angela S. as the "appropriate guardian" of the child. It is from these orders that Mother now appeals.

"This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. Pt. 6, *In re Donald M.*, 233 W. Va. 416, 758 S.E.2d 769 (2014) (citing Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)).

On appeal, Mother asserts four assignments of error, which we will address out of order for efficiency and clarity. First, Mother argues that the circuit court abused its discretion by granting Angela S.'s petition for guardianship of the child because the court failed to properly apply West Virginia Code § 44-10-3 (2013). In support of her argument, Mother asserts that there is not clear and convincing evidence that one or more of the requisite statutory factors set forth in subsection (f) of the statute warranted the guardianship. We agree.

Guardianship of a child in West Virginia is governed by statute. *See* Syl. Pt. 5, in part, *In re Antonio R.A.*, 228 W. Va. 380, 719 S.E.2d 850 (2011) ("A family or circuit court's authority to appoint a suitable person as a guardian for a minor . . . is derived from West Virginia Code § 44-10-3[.]"). Specifically, West Virginia Code § 44-10-3(f) states as follows:

---

[11] As stated in the circuit court's order granting the petition for guardianship, the guardian ad litem opined that Mother and Father were "not in a position to parent [the child], and [that] the issue [was] actually whether [Grandmother] or [Angela S.] [is] the appropriate caregiver for the [the child]." The guardian ad litem further opined that "both homes," presumably referring those of Angela S. and Grandmother, "[were] acceptable and appropriate for [the child], however, [Angela S.] has been [the child's] primary caretaker for more than two (2) years and has been responsible for [the child's] medical needs, as well as provided [the child] with emotional support and met all [of the child's] financial needs."

[t]he court may appoint a guardian for a minor if the court finds by clear and convincing evidence that the appointment is in the minor's best interest and:
(1) The parents consent;
(2) The parents' rights have been previously terminated;
(3) The parents are unwilling or unable to exercise their parental rights;
(4) The parents have abandoned their rights by a material failure to exercise them for a period of more than six months; or
(5) There are extraordinary circumstances that would, in all reasonable likelihood, result in serious detriment to the child if the petition is denied.

*Id.* As to the best interests of the child, the West Virginia Legislature has stated that the best interests of the child may be facilitated by ensuring (1) stability, (2) collaborative parenting and agreement about the child's upbringing, (3) continuity of existing parent-child attachments, (4) meaningful contact between a child and each parent, (5) caretaking and parenting relationships by adults who love the child, know how to provide for the child's needs, and who place a high priority on doing so, (6) security from exposure to physical or emotional harm, (7) expeditious, predictable decision-making and avoidance of prolonged uncertainty respecting arrangements for the child's care and control, and (8) meaningful contact between a child and siblings, including half-siblings. *See* W. Va. Code § 48-9-102. *See also In re Clifford K.,* 217 W. Va. 625, 619 S.E.2d 138 (2005).

The guardian ad litem recommended that factor five weighed in favor of awarding the guardianship to Angela S. However, upon review of the record, we cannot find that there is clear and convincing evidence that "extraordinary circumstances" would "result in serious detriment to the child if the petition was denied." Thus, we find that the circuit court abused its discretion by adopting the guardian ad litem's recommendation and appointing Angela S. as the child's guardian.

Next, Mother argues that the circuit court abused its discretion by failing to give her statutory custodial preference in the absence of a finding that she was an unfit parent. We agree. Pursuant to West Virginia Code § 44-10-3(h),

[a]ny suitable person may be appointed as the minor's guardian. A parent *shall receive priority* subject only to the provisions of subsections (d) and (f) above.[12] However, in every case the competency and fitness of the

---

[12] Subsection (d) does not apply to the facts of this case because there are no other, contemporaneous proceedings concerning the child's custody. *See* W. Va. Code § 44-10-3(d) ("Any responsible person with knowledge of the facts regarding the welfare and best interests of a minor may petition for an appointment of a guardian except a parent or other person whose rights to the minor have been terminated. No guardianship petition may be considered if the child who is the subject of the petition is involved in another court

proposed guardian must be established and a determination made that the appointment is in the best interest of the child.

(Emphasis added). The Supreme Court of Appeals of West Virginia ("SCAWV") has examined the statutory language of subsection (h) and has held that the wording of West Virginia Code § 44-10-3 "is clear and plainly expresses the Legislature's intent to favor a child's parent, if he/she is fit, to serve as his/her child's guardian provided such custodial placement comports with the child's best interests." *Terrence E. v. Christopher R.*, 243 W. Va. 202, 209, 842 S.E.2d 755, 762 (2020).

The SCAWV has held that,

[i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. Pt. 1, *In re Willis,* 157 W. Va. 225, 207 S.E.2d 129 (1973). Further, the United States Supreme Court has recognized that the right of a parent to make decisions concerning the care, custody, and control of her children is among the most cherished fundamental liberty interests. *See Troxel v. Granville,* 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). The SCAWV has further held "that there is a presumption that fit parents act in the best interests of their children." *Lindsie D.L. v. Richard W.S.*, 214 W. Va. 750, 755, 591 S.E.2d 308, 313 (2003).

However, the SCAWV has also made clear that "[s]uperior to any rights of parents to the custody of their own children, however, is the overriding consideration of the child's best interests. Thus, the natural right of parents to the custody of their children is always tempered with the courts' overriding concern for the well-being of the children involved." *Kessel v. Leavitt,* 204 W. Va. 95, 174, 511 S.E.2d 720, 799 (1998).

This Court recognizes that striking a balance between a biological parent's constitutional rights and a child's best interests can be difficult. The SCAWV considered this delicate balance in *Honaker v. Burnside,* 182 W. Va. 448, 388 S.E.2d 322 (1989). In *Honaker*, a fit biological father petitioned for custody of his daughter. 182 W. Va. at 450, 388 S.E.2d at 323-324. The child lived with her biological mother, stepfather, and half-

---

proceeding relating to custody or guardianship or if the petitioner is a parent seeking custodial rights adverse to the other parent.").

10

sibling from an early age until the mother's tragic death, when the stepfather was appointed as her guardian pursuant to the mother's last will and testament. *Id.* The biological father filed a petition arguing that "an unoffending natural parent should be entitled to custody of his or her child if such parent has not abandoned such child nor has in any manner been proven unfit." *Id.* The circuit court agreed and granted custody to the biological father. *Id.* at 450-451, 388 S.E.2d at 324. On appeal, the *Honaker* Court acknowledged that the child's best interest "is of immeasurable importance," but also recognized the right of a biological parent to raise his or her own child. *Id.* at 451, 388 S.E.2d at 324.

In the instant matter, Angela S. claims to be the psychological parent of the child and such was the basis of her petition for guardianship. In the case of *In re Clifford K.,* the SCAWV defined "psychological parent" as

> a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian.

Syl. Pt. 3, *In re Clifford K.,* 217 W. Va. 625, 619 S.E.2d 138.

Here, the circuit court made no finding that Mother was abusive, neglectful, or otherwise unfit. Likewise, neither CPS nor the guardian ad litem's report opined that Mother was unfit. In fact, CPS recommended that it may be in the best interest of the child to be in Mother's custody because Mother had worked on the issue that had necessitated the need for the child to live with Amy S. and Angela S. in the first place. However, the circuit court's orders make no reference to the CPS report. Instead, the circuit court relied solely on the guardian ad litem's investigation and statements she made at the final hearing, even though the guardian ad litem's investigation was completed in less than three days, she never observed the child with Mother, and conducted nearly every interview by telephone. Further, the guardian ad litem's report, like the circuit court's order, is silent as to what, if any, parenting time Father should be granted.

The record establishes that the child undoubtedly has a bond with Angela S. and that Angela S. has played an immensely important role in the child's life. However, testimony revealed that the parties were aware that the temporary guardianship agreement was never intended to be permanent, and that Mother and Grandmother have remained fixtures in the child's life. Significantly, we find there was no evidence presented that Mother and Father were unfit or had abused, neglected, or abandoned their child.

Therefore, we conclude that the circuit court erred by failing to properly apply the relevant law to the facts of this case. The court may not divest Mother of her custodial rights simply because Angela S. was a "competent and fit" guardian or a "psychological parent." As we previously mentioned, although Angela S. and the child shared a significant relationship, such bond cannot alter the otherwise secure natural rights of Mother. *See Honaker,* 182 W. Va. at 452, 388 S.E.2d at 325. "While courts always look to the best interests of the child in controversies concerning his or her custody, such custody should not be denied to a parent merely because some other person might possibly furnish the child a better home or better care." Syl. Pt. 3, *Hammack v. Wise*, 158 W. Va. 343, 211 S.E.2d 118 (1975). Thus, we find that the circuit court committed error by depriving Mother of her constitutional rights as the child's biological parent when it appointed Angela S. as the child's legal guardian in the absence of a finding that Mother was an unfit parent.

Based upon the foregoing, we reverse the circuit court's March 26, 2024, orders, and return the child to Mother. The Clerk of this Court is hereby directed to issue the mandate contemporaneously herewith.

Reversed.

**ISSUED:** June 12, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge Ryan White

12